# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**ASHLEY L. JACOBSON,** *individually and on behalf of all others similarly situated*,

    Plaintiff,

v.

**ZEROED-IN TECHNOLOGIES, LLC and DOLLAR TREE, INC.,**

    Defendants.

**Case No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Ashley L. Jacobson, individually and on behalf of all similarly situated persons, alleges the following against Zeroed-In Technologies, LLC ("Zeroed-In") and Dollar Tree, Inc. ("Dollar Tree") (collectively, "Defendants") based on personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

## I.  INTRODUCTION

1.  Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and other similarly situated employees' ("Class Members," as defined *infra*) sensitive information, including names, dates of birth, and Social Security numbers ("personally identifiable information" or "PII").

2.  Zeroed-In is a data technology company that sells workforce analytical software to its clients.[1] The software uses artificial intelligence to "monetize HR's data science activities"

---

[1] https://www.zeroedin.com/about-zeroedin/ (last visited Dec. 4, 2023).

so that its clients can "make accurate and timely HR decisions."[2]

3.      One of Zeroed-In's clients is Dollar Tree, which owns the Dollar Tree & Family Dollar chain of low-price retail stores.

4.      Upon information and belief, Zeroed-In's clients including Dollar Tree required their employees (including Plaintiff and Class Members) to entrust them with sensitive, non-public PII as a condition employment. Defendants retain this information for at least many years and even after the consumer relationship has ended.

5.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6.      On or before August 8, 2023, Zeroed-In discovered suspicious activity related to specific network systems (the "Data Breach").[3] In response, Zeroed-In "immediately took steps to secure the systems and launched an investigation into the nature and scope of the activity."[4] As a result of its investigation, Zeroed-In concluded that Plaintiff's and Class Members' PII was compromised in the Data Breach, including names, dates of birth, and Social Security numbers.[5] In a filing with the Office of the Maine Attorney General, Zeroed-In revealed that the PII of 1,977,486 million individuals is believed to have been exposed by the Data Breach.[6]

7.      Defendants failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions and their utter

---

[2] *Id*.
[3] *See* Notice Letter, attached as ***Exhibit A*** ("Notice Letter").
[4] *Id.*
[5] *Id.*
[6]     https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Dec. 4, 2023).

failure to protect employees' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8.      Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

9.      Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by their IT vendors to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

10.      Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

11.      Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of

the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

12.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## II.  PARTIES

13.     Plaintiff Ashley L. Jacobson is, and at all times mentioned herein was, an individual citizen and resident of Minnesota. Plaintiff received a Notice Letter dated November 27, 2023.[7]

14.     Defendant Zeroed-In is a limited liability company validly existing and organized under the laws of Florida with its principal place of business located at 11037 Harbor Yacht Ct., #201, Fort Myers, Florida 33908.

15.     Defendant Dollar Tree is a corporation validly existing and incorporated under the laws of Virginia, with its principal place of business located at 500 Volvo Parkway, Chesapeake, Virginia 23320.

## III.  JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

---

[7] *See* Ex. A.

interest and costs. The number of class members is in the millions, many of whom reside outside the state of Florida and have different citizenship from Defendants, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

17.     This Court has general personal jurisdiction over Zeroed-In because it is headquartered in this District. This Court has specific personal jurisdiction over Dollar Tree in this case because Dollar Tree purposely availed itself of Zeroed-In's services with respect to Plaintiff's claims.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, Defendants have harmed Class Members residing in this District, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## IV.   FACTUAL ALLEGATIONS

### A.     *Defendants' Businesses*

19.     Zeroed-In sells workforce analytics software that uses artificial intelligence to assist HR departments in making decisions.[8] On its website, it advertises it has more than 30,000 registered users, and 2.7 million "work lives" in its databases.[9]

20.     Dollar Tree operates over 8,000 low-price retail stores in the U.S. and Canada, under the Dollar Tree and Family Dollar brands.[10]

21.     Plaintiff and Class Members are current and former employees of Zeroed-In's clients, including Dollar Tree.

22.     As a condition of employment, Zeroed-In's clients including Dollar Tree require

---

[8] https://www.zeroedin.com/about-zeroedin/ (last visited Dec. 4, 2023).
[9] *Id*.
[10] https://corporate.dollartree.com/about/our-brands/dollar-tree (last visited Dec. 4, 2023).

their employees, including Plaintiff and Class Members, to entrust them with highly sensitive PII.

23.     The information held by Defendants in their computer systems or those of their vendors at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

24.     Upon information and belief, Dollar Tree made promises and representations to its employees, including Plaintiff and Class Members, that the PII collected from them as a condition of employment would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendants would delete any sensitive information after they were no longer required to maintain it.

25.     Plaintiff and Class Members provided their PII to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

26.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Defendants to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

27.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of their IT vendors and affiliates. Defendants have a legal duty to keep consumer's PII safe and confidential.

28.     Defendants had obligations created by the FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to

protect it from unauthorized access and disclosure.

29.      Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendants could not perform the services they provide.

30.      By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**B.      *The Data Breach***

31.      According to the Notice Letter, Zeroed-In first discovered suspicious activity in its systems on August 8, 2023, and completed its investigation and "a review of the contents of the systems to what information was present at the time of the incident and to whom the information relations" on August 31, 2023.[11] Nevertheless, it took an additional 3 months, until November 27, 2023, to notify Plaintiff and Class Members of the Data Breach.[12]

32.      Omitted from the Notice Letter are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

33.      This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data

---

[11] Ex. A.
[12] *Id*

Breach is severely diminished.

34.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendants failed to exercise due diligence in selecting its vendors or deciding with whom they would share sensitive PII.

35.     The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members, including their names, dates of birth, and Social Security numbers. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

36.     Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiff has experienced suspicious spam and believes this be an attempt to secure additional PII from him.

**C.     *Defendants Acquire, Collect, and Store Plaintiff's and Class Members' PII.***

37.     As a condition to obtain loyalty program membership at Zeroed-In, Plaintiff and Class Members were required to give their sensitive and confidential PII to Defendant.

38.     Defendants retain and store this information and derives a substantial economic benefit from the PII that they collect. But for the collection of Plaintiff's and Class Members' PII, Defendants would be unable to perform their services.

39.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

40.     Plaintiff and Class Members have taken reasonable steps to maintain the

confidentiality of their PII and relied on Defendants to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

41.     Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members or by exercising due diligence in selecting their IT vendors and properly auditing those vendor's security practices.

42.     Upon information and belief, Defendants made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

43.     Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**E.     *Defendants Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Suspectable to Cyber Attacks.***

44.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the breach.

45.     Data thieves regularly target companies like Defendants' due to the highly sensitive information in their custody. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

46.     In 2021, a record 1,862 data breaches occurred, resulting in approximately

293,927,708 sensitive records being exposed, a 68% increase from 2020.[13]

47.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

48.     As a custodian of PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class members, and of the foreseeable consequences if their data security systems, or those of their vendors, were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

49.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

50.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

51.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to potentially thousands of individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed

---

[13] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (https://notified.idtheftcenter.org/s/), at 6.

by the exposure of the unencrypted data.

52.     In the Notice Letter, Zeroed-In offers to cover identity monitoring services for a period of 12 months. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

53.     Zeroed-In's offer of credit and identity monitoring establishes that Plaintiff's and Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendants' computer systems.

54.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

55.     The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

56.     As corporation in possession of their employees' and former employees' PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**F.** *Value of Personally Identifiable Information*

57.      The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

58.      The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[16]

59.      For example, PII can be sold at a price ranging from $40 to $200.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

60.      Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

---

[14] 17 C.F.R. § 248.201 (2013).

[15] *Id.*

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/    (last visited Dec. 4, 2023).

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Dec. 4, 2023).

[18] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Dec. 4, 2023).

61.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[19]

62.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

63.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

**G.     Defendants Failed to Comply with FTC Guidelines.**

64.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

---

[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Dec. 4, 2023).

[20] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Dec. 4, 2023).

65.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal employee information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

66.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

67.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of their data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice

14

prohibited by Section 5 of the FTCA.

69.     Defendants were at all times fully aware of their obligation to protect the PII of employees yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**I.**     ***Defendants Failed to Comply with Industry Standards.***

70.     As noted above, experts studying cybersecurity routinely identify institutions as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

71.     Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendants, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

72.     Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

73.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5,

PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

74.     Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**J.     *Defendants Breached Their Duty to Safeguard Plaintiff's and Class Members' PII.***

75.     In addition to their obligations under federal and state laws, Defendants owed a duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the PII of Class Members

76.     Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data and failed to audit, monitor, or ensure the integrity of their data security practices. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.    Failing to adequately protect employees' PII;

    c.    Failing to properly monitor their own data security systems for existing intrusions;

    d.    Failing to audit, monitor, or ensure the integrity of their vendor's data security

practices;

e.  Failing to sufficiently train their employees and vendors regarding the proper handling of their employees' PII;

f.  Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

g.  Failing to adhere to industry standards for cybersecurity as discussed above; and

h.  Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' PII.

77.    Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted PII.

78.    Had Defendants remedied the deficiencies in their information storage and security systems or those of their vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**J.    *Common Injuries & Damages***

79.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium

damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

> **K.**     ***The Data Breach Increases Victims' Risk of Identity Theft.***

80. Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

81. The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

82. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

83. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

84. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social

engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

85.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[21]

86.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

87.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

88.     The existence and prevalence of "Fullz" packages means that the PII stolen from

---

[21] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Dec. 4, 2023).

the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

89.     Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

90.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**L.     *Loss of Time to Mitigate Risk of Identity Theft and Fraud***

91.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

92.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

93.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and

credit record."[22]

94.     These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

95.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[24]



---

[22] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[23] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Dec. 4, 2023).
[24] Jason Steele, "Credit Card and ID Theft Statistics," Oct. 24, 2017, https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Dec. 4, 2023).

96.     And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25]

**M.     *Diminution Value Of PII***

97.     PII is a valuable property right.[26] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

98.     An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[27]

99.     In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[28,29]

100.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[30]

101.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web

---

[25] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 4, 2023) ("GAO Report").
[26] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[27] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 4, 2023).
[28] https://datacoup.com/ (last visited Dec. 4, 2023).
[29] https://digi.me/what-is-digime/ (last visited Dec. 4, 2023).
[30] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Dec. 4, 2023).

according to the Infosec Institute.[31]

102.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

103.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

104.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

105.    The fraudulent activity resulting from the Data Breach may not come to light for years.

106.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

---

[31] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/    (last visited Dec. 4, 2023).

107.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

108.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

**N.    *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.***

109.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

110.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

111.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

112.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class

Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

**O.** *Loss of the Benefit of the Bargain*

113.    Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendants and/or their agents for products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**P.** *Plaintiff's Experience*

114.    Plaintiff Ashley L. Jacobson is a resident of Pine City, Minnesota.

115.    Plaintiff worked for Dollar Tree in 2021.

116.    In order to accept employment at the store, Plaintiff was required to provide his PII to Dollar Tree, and indirectly to Zeroed-In, including her name, date of birth, and Social Security number.

117.    Plaintiff has not worked for Dollar Tree since 2021.

118.    At the time of the Data Breach—on or before August 7 and 8, 2023—Defendants still retained Plaintiff's PII in their system.

119.    Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have

entrusted her PII to Defendants had she known of Defendants' lax data security policies.

120.     Plaintiff received the Notice Letter dated November 27, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, date of birth, and Social Security number.

121.     As a result of the Data Breach, and at the direction of Defendants' Notice Letter, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including contacting credit bureaus and checking her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

122.     Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

123.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants has still not fully informed her of key details about the Data Breach's occurrence.

124.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

125.     As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

126.     Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## V.  CLASS ACTION ALLEGATIONS

127.     Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

128.     Specifically, Plaintiff proposes the following class definition, subject to amendment as appropriate:

> All individuals in the United States whose PII was disclosed in the Data Breach (the "Class").

129.     Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

130.     Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

131.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

132.     <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes that the proposed Class includes about 2 million individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from

Defendants' records.

133.     <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.     Whether Defendants engaged in the conduct alleged herein;

b.     Whether Defendants' conduct violated the FTCA;

c.     When Defendants learned of the Data Breach;

d.     Whether Defendants' response to the Data Breach was adequate;

e.     Whether Defendants unlawfully shared, lost, or disclosed Plaintiff's and Class Members' PII;

f.     Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

g.     Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.     Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

i.     Whether Defendants owed duties to Class Members to safeguard their PII;

j.     Whether Defendants breached their duties to Class Members to safeguard their PII;

k.     Whether hackers obtained Class Members' PII via the Data Breach;

l.     Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.  Whether Defendants breached their duties to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

p.  Whether Defendants' conduct was negligent;

q.  Whether Defendants were unjustly enriched;

r.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

134.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

135.  <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and

protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

136.     <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.     <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

138.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

139.     Finally, all members of the proposed Class are readily ascertainable. Defendants

have access to the names and addresses and/or email addresses of Class Members affected by the

Data Breach. Class Members have already been preliminarily identified and sent a Notice Letter

by Zeroed-In.

## CLAIMS FOR RELIEF

### <u>COUNT I</u>
### Negligence and Negligence Per Se
### (On Behalf of Plaintiff and the Class)

140.     Plaintiff restates and realleges paragraphs 1 through 138 above as if fully set forth

herein.

141.     Zeroed-In's client including Dollar Tree require their employees, including

Plaintiff and Class Members, to submit non-public PII as a condition of employment.

142.     Defendants gathered and stored the PII of Plaintiff and Class Members as part of

their businesses, which affect commerce.

143.     Plaintiff and Class Members entrusted Defendants with their PII with the

understanding that Defendants would safeguard their information.

144.     Defendants had full knowledge of the sensitivity of the PII and the types of harm

that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

145.     By assuming the responsibility to collect and store this data, and in fact doing so,

and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable

means to secure and to prevent disclosure of the information, and to safeguard the information

from theft. Defendants' duties included a responsibility to exercise due diligence in selecting IT

vendors and to audit, monitor, and ensure the integrity of their vendor's systems and practices

and to give prompt notice to those affected in the case of a data breach.

146.     Defendants had a duty to employ reasonable security measures under Section 5

of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

147.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

148.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Zeroed-In and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Zeroed-In with their confidential PII, a necessary part of employment of Zeroed-In's clients including Dollar Tree.

149.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

150.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

151.    Defendants also had duties to exercise appropriate clearinghouse practices to remove former employees' PII they were no longer required to retain pursuant to regulations.

152.    Moreover, Defendants had duties to promptly and adequately notify Plaintiff and the Class of the Data Breach.

153.    Defendants had and continues to have duties to adequately disclose that the PII of Plaintiff and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice

was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

154.     Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to audit, monitor, or ensure the integrity of their vendor's data security practices;

d. Allowing unauthorized access to Class Members' PII;

e. Failing to detect in a timely manner that Class Members' PII had been compromised;

f. Failing to remove former employees' PII they were no longer required to retain pursuant to regulations; and

g. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

155.     Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that

would result to Plaintiff and the Class.

156.     Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

157.     Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

158.     The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

159.     A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

160.     It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

161.     Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

162.     Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

163.     It was therefore foreseeable that the failure to adequately safeguard Class

34

Members' PII would result in one or more types of injuries to Class Members.

164.     Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

165.     Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

166.     Defendants' duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

167.     Defendants have admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

168.     But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

169.     There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

170.     As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting

to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

171.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

172.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

173.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

174.    Defendants' negligent conduct is ongoing, in that they still hold the PII of Plaintiff and Class Members in an unsafe and insecure manner.

175.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

176.     Plaintiff restates and realleges paragraphs 1 through 138 above as if fully set forth herein.

177.     Plaintiff and Class Members were required to provide their PII to Zeroed-In's clients including Dollar Tree as a condition of receiving employment.

178.     Plaintiff and the Class entrusted their PII to Defendants. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

179.     In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

180.     Implicit in the agreement between Plaintiff and Class Members and the Defendants to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

181.     The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

182.    Defendants required Plaintiff and Class Members to provide their PII as a condition of employment. Plaintiff and Class Members accepted the offers for employment and provided their PII to Defendants.

183.    In accepting the PII of Plaintiff and Class Members, Defendants understood and agreed that they were required to reasonably safeguard the PII from unauthorized access or disclosure.

184.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

185.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

186.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

187.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

188.    Defendants breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

189.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

190.     Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

191.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT III
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

192.     Plaintiff restates and realleges paragraphs 1 through 138 above as if fully set forth herein.

193.     This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count II).

194.     Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they provided employment services to Zeroed-In's clients including Dollar Tree, and in so doing also provided Defendants with their PII. In exchange, Plaintiff and Class Members should have received from Defendants the services that were the subject of the transaction and should have had their PII protected with adequate data security.

195.     Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendants profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

196.     Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

197.     Defendants acquired the PII through inequitable record retention as they failed to disclose the inadequate data security practices previously alleged.

198.     If Plaintiff and Class Members had known Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII with Defendants.

199.     Plaintiff and Class Members have no adequate remedy at law.

200.     Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

201.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

202.     Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

203.     Plaintiff and Class Members may not have an adequate remedy at law against

40

Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE**,** Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A.   For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.   For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.   For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.   prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.   requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.   requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.    prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix.    requiring Defendants to conduct regular database scanning and securing checks;

x.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.   requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential

personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvi.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 11, 2023.        Respectfully submitted,

*/s/ Jeff Ostrow*_____
Jeff Ostrow
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301

Telephone: 954-525-4100
ostrow@kolawyers.com

William B. Federman*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
wbf@federmanlaw.com

*Counsel for Plaintiff and the Putative Class*

**Motion for Admission* Pro Hac Vice *Forthcoming*